**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ARTHUR JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00233** |
| | ) | **Judge Aleta A. Trauger** |
| **ALUDYNE US LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the defendant Aludyne US LLC's Motion for Summary Judgment (Doc. No. 22), seeking dismissal of plaintiff Arthur Jones' discrimination, hostile work environment, and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 and his claim for violation of the overtime pay provisions of the Fair Labor Standards Act ("FLSA") (*see* Compl., Doc. No. 1). For the reasons set forth herein, the motion will be granted in part and denied in part. Specifically, the court finds that a material factual dispute precludes summary judgment on the FLSA claim but that the claim is governed by a two-year statute of limitations. The defendant is entitled to summary judgment on the Title VII and § 1981 claims.

## I.    LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion

for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). To survive a motion for summary judgment, the plaintiff "must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Anderson*, 477 U.S. at 251).

## II.     FACTS[1] AND PROCEDURAL HISTORY

### A.     Aludyne's Employment Policies

Aludyne manufactures cast and machined automotive components at its facility in

---

[1] Unless otherwise indicated, the facts set forth herein are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 27) and are undisputed for purposes of the Motion for Partial Summary Judgment.

Clarksville, Tennessee (the "Clarksville facility"). Aludyne has equal employment opportunity and anti-discrimination, harassment, and workplace bullying policies, as well as a procedure for reporting violations of these policies. (*See* Employee Handbook, Doc. No. 24-1 at 4–7.)

Aludyne also has an anti-theft policy pursuant to which "[p]roperty theft of any type will not be tolerated. We consider property theft to be the unauthorized use of company services or facilities or the taking of any company property for personal use." (*Id.* at 14.) The Employee Handbook contains a list of "examples" of conduct "considered unacceptable in the workplace" that "may result in disciplinary action, up to and including termination of employment." (*Id.* at 9.) The list of unacceptable conduct includes "[d]ishonesty, theft, attempted theft or misappropriation of Company, vendor, supplier, visitor, customer or employee property or equipment, or failing to report known or suspected activities." (*Id.*)

Aludyne requires all employees to wear certain personal protective equipment ("PPE"), including "safety glasses, safety shoes/boots with protective or safety certified shoes, [and] earplugs," as well as "additional items of protective clothing or equipment as required for their particular job." (*Id.* at 13.) Failure to wear required safety apparel is on the list of unacceptable conduct that may result in discipline or termination. (*Id.* at 9.)

Aludyne hired Arthur Jones to work at the Clarksville facility in August 2021. Jones went through the Employee Handbook during orientation, and he later received and read a copy of the handbook. (Jones Dep. 41–42.)[2]

### B. The Plaintiff's Discrimination Complaint, Disciplinary Write-Ups, and Termination

On July 6, 2022, Jones reported seeing offensive graffiti—a swastika and the letters

---

[2] Both parties filed a complete copy of Jones' deposition transcript. (Doc. Nos. 24-4, 27-1.)

KKK—carved into the cushioning pad at his work station. (Jones Dep. 53.) He reported the incident to his supervisor at the time, Justin Hall, and to Human Resources Manager Lori Sears.

According to Sears, when Jones reported seeing a swastika at his work station, she asked him he if had any idea who would have drawn the graffiti, and he said he did not know. (Doc. No. 24-2, Sears Decl. ¶ 4.) She claims she asked him if he had "experienced any other racially insensitive issues, and he said no." (*Id.*)

Sears also states that, upon receiving Jones' report, she immediately initiated an investigation. (*Id.* ¶ 5.) She personally went to the die cast area where Jones' work station was located but did not see any graffiti. (*Id.* ¶ 6.) She interviewed second shift employees and supervisors in the area about whether they had seen or heard reports of the racially charged graffiti, and the next day she interviewed individuals on the first shift who worked in that area. (*Id.* ¶ 7.) No one she talked to knew about the graffiti or had seen any similar markings, and no one reported "issues of racially insensitive incidents during the investigation." (*Id.* ¶ 8.) Sears was unable to substantiate the graffiti's existence or who may have been responsible for it. (*Id.* ¶ 9.) Because Jones failed to participate further in the investigation and she could not corroborate his claim, Sears closed the investigation as inconclusive. (*Id.* ¶ 13.)

Regarding Jones' involvement in the investigation, Sears states that she "set up multiple appointments with Jones to discuss the investigation, but he was not cooperative." (*Id.* ¶ 10.) Specifically, she scheduled appointments with him on July 11, 14, and 19, 2022, to give Jones the opportunity to share any additional information, but he "did not appear for any of these meetings." (*Id.*)

Jones initially testified that, aside from his complaint about the swastika, he never submitted any other complaint about race discrimination or harassment. (Jones Dep. 42, 45.)

However, he subsequently stated that he heard other employees make statements like "it's getting dark in here" and "the darkness is getting overwhelming" "all the time," "maybe twice a week," while he was employed by Aludyne and that he reported these comments to Sears at the same time he complained about the swastika. (*Id.* at 48–49.) Sears denies that Jones or anyone else ever reported to her that employees were making these comments or any statements "of that nature" and affirmatively avers that she "never heard anything of the sort at the facility." (Sears Decl. ¶ 11.) She also denies that Jones reported to her that he felt like he was being discriminated against because of his race. (*Id.* ¶ 12.)

Jones, for his part, did not dispute that he missed appointments with Sears, but he claims that he was unable to meet with her after the swastika incident because, "after [he] complained about the swastika and the graffiti, [he] was put on suspension and wasn't allowed in the building." (Jones Dep. 55.) He also disputes that Sears conducted any investigation. He testified that he "complained for . . . weeks to her, and . . . asked for an outcome on [the] investigation," and he claimed to possess evidence showing that Sears did not conduct an investigation in the form of documents and text messages that he turned over to the defendant in discovery. (*Id.* at 56.) The text messages to which he referred were apparently made exhibits to the plaintiff's deposition (*see id.* at 57), but neither party introduced them into the court's record. Defense counsel characterized them during the plaintiff's deposition as showing that Sears was "trying to contact" Jones but "for various reasons," they did not connect. (*Id.* at 58.) The plaintiff disputed this characterization, stating, "In actuality at this time, I was trying to get into the building and see her personally, and she wanted to keep scheduling phone calls. She would not see me in person." (*Id.* at 58.) He also disputes that he failed to show up for in-person meetings scheduled by Sears. (*Id.*) He claims he

"actually took her the Complaint"[3] and texted her a picture of the graffiti on August 3, 2022. (*Id.* at 59.)

Jones was not disciplined for his complaint about the swastika. (Jones Dep. 60.) However, just over a month later, on August 9, 2022, he was written up for stealing self-service canteen items from the breakroom. (Sears Decl. ¶ 29; *see also* Doc. No. 24-8, Aug. 9, 2022 Corrective Action Form.) Jones testified that he selected two items and tried to pay for them, but the system did not function correctly, and he learned later that payment for one of the items, valued at $2.72, did not go through. (Jones Dep. 31–32.) As Sears explained it, the monitoring system in the breakroom showed that Jones attempted to use three different cards to complete his purchase of canteen items before giving up and "tak[ing] the snack items to a table and [eating] them even though he failed to purchase them." (Sears Decl. ¶¶ 33–36.) Jones testified that he was not the only employee who had been charged with theft, that they had "tried to explain the situation about the machine," and that the company eventually "got somebody out to fix it." (Jones Dep. 36.) In any event, according to Sears, she had a "coaching conversation" with Jones about the incident and explained that the "consequences for the theft included a last chance warning," meaning that "any further violations of Aludyne's policies could lead to further disciplinary action, including, but not limited to[,] termination of his employment." (Sears Decl. ¶¶ 38, 39.) A white employee, Tyler Rickerson, similarly received a "Policy Violation Last Chance" Corrective Action Form for "Theft of Canteen Items" two weeks earlier, on July 26, 2022. (*Id.* ¶ 40; *see also* Doc. No. 24-9.) The plaintiff was not terminated in connection with this incident.

According to Sears, Aludyne conducted a "fire-retardant PPE die cast training" on August

---

[3] It is unclear to what "Complaint" the plaintiff is referring. There is no written complaint in the record concerning the swastika incident, and the plaintiff's EEOC complaint was not filed until October 4, 2022. (Doc. No. 1-1.)

31, 2022. (Sears Decl. ¶ 41.) At that time, Aludyne implemented a new policy requiring employees to wear fire-retardant ("FR") shirts in addition to other PPE, to protect them in the die cast areas. (*Id.*) According to the plaintiff, this "training" consisted of having employees sign a document, and they were "told . . . something about fire retardant PPE." (Jones Dep. 70–71; *see also* Doc. No. 24-10, training acknowledgement form.)

According to Sears, despite having been "trained" that day, Jones "had to be told twice within two and a half hours that he needed to have his FR shirt on at all times in the die cast area," and he was written up for refusing to wear the required PPE. (Sears Decl. ¶ 42.) According to Sears, Aludyne is "consistent in its enforcement of the PPE policy," and other employees have been disciplined and written up for similar PPE violations. (*Id.* ¶ 43.) The plaintiff does not dispute that he was not wearing his FR shirt. He claims he had just "c[o]me in, started work, and took [his] shirt off," when his supervisor approached him and told him, "we just implemented this rule today, so you have to put your shirt back on." (Jones Dep. 35.)

The next day, September 1, 2022, Hall reported to Sears and to Operations Manager Jeff Crandall that Jones had been absent from his work station multiple times that day and also was not wearing his FR shirt again. (Sears Decl. ¶¶ 44–45.) Crandall confirmed that he had noticed Jones away from his work station that day too. (*Id.* ¶ 46.) Another supervisor reported to Sears on September 3, 2022 that Jones was absent from his work station that day. (*Id.* ¶ 47.) Jones testified, somewhat vaguely, that he was disciplined for being absent from a machine that he was not assigned to work on. (*See* Jones Dep. 61 ("Well, the machine that was down was 230. My machine was not down. In the . . . report that they gave, they said I was working at machine 230, and I wasn't. I was working at machine 220.").)

Jones was suspended on September 4, 2022, pending further review of his "performance

and misconduct issues." (Sears Decl. ¶ 48.) "Given the seriousness of the violations and the fact that Jones was on a last chance agreement, Aludyne management decided to terminate Plaintiff's employment." (*Id.* ¶ 53.) Sears scheduled a series of telephone calls with Jones to relay this decision, but, after Jones failed to answer four scheduled telephone calls on September 13 and 14, 2022, Sears mailed him a letter notifying him that his employment had been terminated.[4] (*Id.* ¶¶ 49–52, 54.) Jones called Sears back on September 15, 2022, and Sears informed him then over the telephone that his employment had been terminated. (*Id.* ¶ 55.)

According to Sears, Jones' termination had "nothing to do with his much earlier report of graffiti." (*Id.* ¶ 57.) It is undisputed that Aludyne consistently terminates employees who commit serious policy violations while on last-chance agreements.

### C. Facts Relating to the Plaintiff's FLSA Claim

The plaintiff does not dispute Aludyne's assertion that it maintains a

Time Cards/Records policy that states: "[b]y law, the Company is obligated to keep accurate records of the time worked by each non-exempt employee. This is done by either time cards or other written documentation. The time card is the only way the payroll department knows how many hours a non-exempt employee has worked and how much to pay the employee. The time card indicates when the employee arrived and when the employee departed each day."

(Pl.'s Resp. to Aludyne SUMF ¶ 47.)[5]

According to the plaintiff, on a typical day, he and other employees on his shift would "go to the floor for the first 30 minutes that we . . . were in the building for a pass-over meeting and the duties of the shift," but they were not permitted to clock in until after that meeting. (Jones Dep.

---

[4] In his Response to the defendant's Statement of Undisputed Material Facts, Jones denies receiving these calls, but his record citation does not support this denial. (*See* Doc. No. 27, Resp. to ¶ 44 (citing Jones Dep. 61:2–8).) Even if his denial were sufficient to create a factual dispute, the dispute is not material.

[5] Aludyne cites the Employee Handbook in support of this statement, but the quoted statement is not in the Employee Handbook.

18.) After clocking in, he had a fifteen-minute break during the first half of his shift, a thirty-minute meal break, and another fifteen-minute break during the second half of his shift. He did not clock out for any of these breaks, including the meal break. (*Id.* at 19–20.) He did not clock out until the next machine operator came to relieve him from his station. (*Id.* at 21.)

Sears states in her Declaration that time clocks in the Clarksville facility are located at the employee entrance, in the breakroom, and on the production floor. (Sears Decl. ¶ 14.) The "clock-in process records the official start time of each employee's shift and ensures accurate payroll processing." (*Id.* ¶ 15.) According to Sears, from sometime in 2022 through May 2024, the Clarksville facility participated in "passdown meetings" at the time of shift changes, for the purpose of discussing safety, quality alerts, maintenance issues, and so forth. (*Id.* ¶¶ 16–17.) Sears asserts that these meetings typically lasted five to fifteen minutes and that employees were required to clock in before participating in the pass-down meetings. (*Id.* ¶ 19.) Aludyne maintains that time spent in the pass-down meetings was included in employees' total time worked, was compensated, and was included in overtime pay calculations, if applicable. (*Id.* ¶ 20.)

As Sears explained, Aludyne also pays employees for the time spent on meal breaks rather than having employees clock out for that time, which amounts to payment for an extra thirty minutes per shift, including additional overtime pay, if applicable. (*Id.* ¶¶ 58–59.) The plaintiff does not dispute that he did not clock out during his shifts and was paid for time spent on meal breaks.

It appears that, through April 17, 2022, Jones was regularly scheduled to work twelve 8.25-hour shifts (beginning at 10:15 p.m. and ending at 6:30 a.m.) out of every fourteen days. Beginning on April 18, 2022, he began working typically seven twelve-hour shifts (beginning at 6:30 p.m. and ending at 6:30 a.m.) per fourteen-day period. (Doc. No. 24-5.) The Time Detail Report for that

time shows that, beginning on March 16, 2022, he typically clocked in ten to fifteen minutes before his shift was scheduled to start. Beginning on April 18, 2022, when he changed to a twelve-hour shift, and continuing until September 3, 2022, he typically clocked in anywhere from ten to twenty-five minutes before his 6:30 p.m. shift was scheduled to begin. (*See* Doc. No. 24-6.) He was paid overtime for any clocked-in time in excess of forty in a workweek.

### D. Procedural History

Jones filed a discrimination complaint with the Tennessee Human Rights Commission on October 4, 2022, asserting race discrimination and retaliation claims. (Doc. No. 1-1.) The EEOC issued the Notice of Right to Sue on December 5, 2023 (Doc. No. 1-2), and the plaintiff filed this lawsuit on March 1, 2024 (Doc. No. 1). The Complaint asserts claims for (1) violation of the FLSA's overtime provisions, based on the defendant's alleged failure to pay him for time spent at pre-shift pass-down meetings; (2) race discrimination, retaliation, and hostile work environment, under Title VII; and (3) race discrimination and retaliation in violation of 42 U.S.C. § 1981.

After conducting discovery, the defendant filed its Motion for Summary Judgment, along with a supporting Memorandum of Law, Statement of Undisputed Material Facts, and the evidentiary material on which its motion is premised. (Doc. Nos. 22–24 and attachments.) The plaintiff filed a Response to the Statement of Undisputed Facts (Doc. No. 27), and he contends in his Response in Opposition to the Motion for Summary Judgment (Doc. No. 28) that material factual disputes preclude summary judgment on any of his claims. The defendant filed a Reply in further support of its motion. (Doc. No. 28.)

## III. DISCUSSION

### A. Hostile Work Environment Claim

To prove a hostile work environment based on race under Title VII, a plaintiff must show that:

> (1) [he] belongs to a protected class; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on race . . . ; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action.

*Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)). To survive summary judgment on a hostile work environment claim, the plaintiff must present sufficient evidence that a reasonable jury could rule in his favor.

The defendant's motion challenges both the fourth and fifth elements of the plaintiff's claim. As for the fourth element, the Supreme Court has instructed that

> whether an environment is "hostile" or "abusive" can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Khalaf*, 973 F.3d at 482.

Although whether alleged harassment is sufficiently severe that it affected a term or condition of employment is generally a question of fact, *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006), the Sixth Circuit has "established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory," *Khalaf*, 973 F.3d at 482 (quoting *Phillips*, 854 F.3d at 327). Under this standard,

> [o]ccasional offensive utterances do not rise to the level required to create a hostile work environment because, [t]o hold otherwise would risk changing Title VII into a code of workplace civility. . . . [E]ven offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements.

*Id.* at 482–83 (internal quotation marks and citations omitted).

In response to the Motion for Summary Judgment, the plaintiff asserts only that the carving of the graffiti—a swastika and the letters KKK—standing alone qualifies as "such extreme conduct" that it a jury could find it "sufficiently severe to constitute a hostile work environment."

(Doc. No. 26 at 3 (citing *Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011)).)

In *Williams*, the Sixth Circuit reaffirmed the proposition that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Williams*, 643 F.3d at 512 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The court also affirmed summary judgment for the defendant on the plaintiff's hostile work environment claim that was premised upon her supervisor's making two racially "insensitive, ignorant, and bigoted" comments over the course of two days. *Id.* at 513. These comments, "[a]lthough despicable," were "not sufficiently 'severe' or 'pervasive' standing alone to create a jury question on [the plaintiff's] racially hostile work environment claim." *Id.* at 513.

Similarly, in this case, a single incident in which offensive graffiti was allegedly carved into the plaintiff's workstation floor mat, though undoubtedly offensive, is neither "pervasive" nor sufficiently severe to have altered the terms and conditions of the plaintiff's employment. *Accord Artis v. Finishing Brands Holdings, Inc.*, 639 F. App'x 313, 324 (6th Cir. 2016) (affirming summary judgment for the defendant on the plaintiff's hostile work environment claim premised upon a "few" comments the plaintiff perceived as racist, racist graffiti in the bathroom that included "KKK writings and a swastika," and a few other isolated incidents); *Jones v. City of Franklin*, 468 F. App'x 557, 567 (6th Cir. 2012) (finding a single incident involving the "anonymous carving of the letters 'KKK' into the wall of a public restroom" not sufficiently severe to create a hostile work environment, under a totality-of-the-circumstances analysis); *cf. Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (noting that "an abundance of racial epithets and racially offensive graffiti . . . may constitute severe and pervasive harassment").

Even if the graffiti incident were sufficient to create a hostile work environment, Jones would still have to establish employer liability—that is, that Aludyne "knew or should have known

about the harassment and failed to act." *Williams*, 643 F.3d at 511. While Jones claims that he was "not meaningfully interviewed" and that Sears did not conduct an investigation, the record simply does not support his conclusory assertion that Sears did not investigate and did not attempt to meet with him to discuss the incident. Jones claims the only reason he did not meet with her was that he was suspended, but the record establishes that he was not suspended until nearly two months after the graffiti incident. Moreover, there is no evidence that the plaintiff was exposed to the graffiti for more than a day, that Aludyne knew about the incident before Jones reported it, or that it was able to confirm who had done it. On these facts, Aludyne cannot be held liable for whatever effect the graffiti incident may have had on Jones' work environment. The incident therefore cannot form the basis of his hostile-work-environment claim. *Accord Jones*, 468 F. App'x at 567.

The plaintiff makes no attempt to rely on his allegations that unidentified co-workers who had tattoos that the plaintiff identifies with hate groups ("[r]uins, lightening bolts, and . . . Thor's hammer") made comments among themselves, but in his presence, like "it's getting dark in here" and "the darkness is getting overwhelming." (Jones Dep. 46–47, 49.) Regardless, even if they are considered with the graffiti incident, the plaintiff has not established that these non-specific comments, made by unidentified individuals in the plaintiff's presence but not directed to him, were sufficiently severe or pervasive that any jury could conclude that they created a hostile work environment.

Aludyne is entitled to summary judgment on the plaintiff's hostile work environment claim.

**B.     Discrimination Under Title VII and § 1981**

Title VII makes it unlawful for an employer to discriminate against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981

guarantees to persons of all races "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Claims of race discrimination under Section 1981 are analyzed under the same standards as claims of race discrimination brought under Title VII. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018).

"Where a plaintiff relies on circumstantial evidence, courts typically apply the three-part burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775–76 (6th Cir. 2016). Under this framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination." *Id.* at 776 (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If he does so, the defendant must then "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* Assuming it does so, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* (quoting *White*, 533 F.3d at 391–92). While applying this framework, courts must remain mindful that the true question is "whether there exists a genuine issue of material fact" that precludes summary judgment. *Id.* (citations omitted)

### 1. The plaintiff's prima facie case

To establish a *prima facie* discrimination claim under Title VII and Section 1981, the plaintiff must show that he (1) is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position in question; and (4) he was replaced by, or treated differently from, similarly situated individuals outside of his protected class. *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021).

The defendant argues that the plaintiff cannot show that he was qualified for his position, because he "violated company policy" by engaging in the conduct that caused the disciplinary write-ups and his ultimate termination. (Doc. No. 23 at 12.) Here, the defendant conflates the issues of a plaintiff's qualifications for his position with the employer's proffered reasons for his termination. At the *prima facie* stage, a court must only consider "a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc); *see also Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) ("We have repeatedly cautioned district courts against 'consider[ing] the employer's alleged nondiscriminatory reason when analyzing the *prima facie* case." (quoting *Wexler*, 317 F.3d at 574)). The inquiry at this stage "should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* Thus, contrary to Aludyne's argument, Jones does not have to show that he was "meeting Aludyne's legitimate business expectations." (Doc. No. 23 at 18.) Rather, a plaintiff can satisfy the qualification prong by showing that he "performed at a level that generally met [his] employer's objective minimum qualifications." *Loyd*, 766 F3d at 590 (citing *Wexler*, 317 F.3d at 575–76). Although the plaintiff fails to address this argument, nothing in the record suggests the plaintiff was unqualified for his job.

Aludyne also argues that the plaintiff cannot show that he was treated differently than similarly situated non-protected employees. It has presented evidence showing that it issued a "Last Chance" written Corrective Action Form to a White employee in connection with a theft incident similar to the one involving Jones just two weeks before the plaintiff's write-up for theft. (*See* Doc. No. 24-9, July 26, 2022 Corrective Action Form issued to Tyler Rickerson; Sears Decl. ¶ 40.) Aludyne also points to discipline issued to a non-African American employee who was

written up for not wearing his FR shirt the day after Jones was disciplined for the same policy violation. (Doc. No. 24-12, Sept. 1, 2022 Corrective Action Form issued to Jonathan Rosado; Sears Decl. ¶ 43.)

In his very cursory Response, the plaintiff offers no evidence that he was treated differently from similarly situated non-Black employees or, indeed, that he was replaced by a non-Black employee. Instead, he asserts only that he "disputes the legitimacy" of the disciplinary infractions, "including that the $2.27 canteen incident was minor and that PPE violations related to new rules were inconsistently enforced." (Doc. No. 26 at 4.) He asserts that "[d]isputes over the factual basis for discipline and pretext are classic jury questions." (*Id.* (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).)

The plaintiff's conclusory contention as to the existence of factual disputes, like his claim that his infractions were minor, does not serve to establish that he was treated differently from similarly situated employees. To reiterate, the *plaintiff* bears the burden of establishing the elements of his *prima facie* case. *Jackson*, 814 F.3d at 776. His burden at this step is "not onerous." *Burdine*, 450 U.S. at 253. "All a plaintiff must do is demonstrate that he . . . 'was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.'" *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). The Sixth Circuit has explained that proposed comparators must be "similarly situated" to a plaintiff "in all of the relevant respects to an employee of a different race who was treated better." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (internal quotation marks and citations omitted). Relevant factors can include whether the other employees "(1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards." *Id.* (citing *Mitchell v.*

*Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). But the Sixth Circuit is also clear that these factors are not rigid and that courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Redlin*, 921 F.3d at 610 (quoting *Ercegovich*, 154 F.3d at 352)).

The standard is not demanding, but the plaintiff has not met it. Because the plaintiff has presented no evidence on this issue and has made no effort to call into question the evidence presented by the defendants, the court finds that he has not established a *prima facie* case of race discrimination. On this basis, the defendant is entitled to summary judgment on the plaintiff's discrimination claims under Title VII and § 1981.

        2.    *Pretext*

In addition, Aludyne argues that, even if the plaintiff were able to establish a *prima facie* case of discrimination, it had legitimate, non-discriminatory reasons for its actions—namely, the plaintiff's disciplinary write-ups, coupled with his being absent from his workstation without authorization. It also argues that the plaintiff cannot offer any evidence of pretext, as the plaintiff admits these violations occurred, admits that the company's Employee Handbook contains express policies covering the plaintiff's conduct, and admits that he was warned each time he received a disciplinary write-up that further infractions could result in termination. (Doc. No. 23 at 21.)

The plaintiff has failed to proffer any evidence from which a reasonable jury could conclude that the proffered reasons for the adverse employment action are pretext for discrimination. For this reason, too, the defendant is entitled to summary judgment on Jones' discrimination claims under Title VII and § 1981.

### C.    Retaliation

Title VII also makes it unlawful to retaliate against employees for engaging in protected conduct—that is, opposing any practice made unlawful by Title VII, or making a charge or

testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII. 28 U.S.C. § 2000e-3(a). Claims of retaliation under Section 1981 are analyzed under the same standards as claims of retaliation under Title VII. *Rogers*, 897 F.3d at 771.

As with a discrimination claim, at the summary judgment stage, the plaintiff may rely on either direct or circumstantial evidence, but if, as here, he offers only circumstantial evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies. *Id.* "Under this framework, the plaintiff must first make out a *prima facie* case of . . . retaliation. Then, 'the burden shifts to the employer to proffer a legitimate, [nonretaliatory] reason for its decision.' If the employer does so, 'the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual.'" *Id.* at 772 (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009) (internal citations omitted).

To establish a *prima facie* case of retaliation, the plaintiff must present evidence sufficient to establish each of the following factors:

> (1) [he] engaged in a protected activity; (2) [his] "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action."

*Id.* at 775 (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

The defendant disputes only the plaintiff's ability to establish the last element—the existence of a causal connection between the plaintiff's termination in September 2022 and his engaging in protected activity two months previously. The defendant also argues that, even if the plaintiff could establish the requisite causal connection, he cannot show that the proffered reasons for his termination were pretextual. In response, the plaintiff argues that he was terminated "shortly" after reporting the racist graffiti and that "[t]emporal proximity alone can establish causation at the summary judgment stage." (Doc. No. 26 at 4 (citing *Mickey v. Zeidler Tool & Die*

*Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).) He also asserts that the "defendant's stated reasons for [the] adverse employment action are factually disputed," making the "question of whether those reasons are pretextual . . . a matter best left for a jury to decide." (*Id.* at 4–5.)

A plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context. *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594–95 (6th Cir. 2007)). A materially adverse employment action in the retaliation context is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). Given this broad definition, the Sixth Circuit has recognized that the question of whether a particular disciplinary reprimand constitutes an adverse employment action for the purpose of a retaliation claim requires a situation-specific inquiry. *See Taylor v. Geithner*, 703 F.3d 328, 338(6th Cir. 2013) ("Although certain written reprimands could rise to the level of an adverse employment action, the written reprimands given here would not have dissuaded a reasonable worker from making a claim of discrimination.").

Aludyne does not refer to the two written disciplinary write-ups as adverse actions, and the plaintiff makes no effort to present them as such in his Response to the Motion for Summary Judgment. Nonetheless, it is undisputed that the write-ups made him vulnerable to termination, so they likely qualify. *See Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 788 (6th Cir. 2024) ("While bad reviews alone do not constitute adverse actions, here the reviews placed Milczak in jeopardy of tangible employment actions, so they suffice."), *reh'g denied*, No. 23-1462, 2024 WL 3205990 (6th Cir. June 17, 2024). Moreover, the first write-up occurred five weeks after the plaintiff reported the racist graffiti, and the second occurred just over three weeks later. His termination

followed closely on the heals of the second write-up. The plaintiff contends that the first write-up was largely due to a machine malfunction, that he tried to pay, and that the value of the item he was charged with stealing was less than $3.00. He also asserts that his PPE violation was due to insufficient training and that he was charged with being absent from a machine at which he was not actually assigned to work.

The Sixth Circuit has clarified that temporal proximity alone generally is *not* sufficient to establish causation. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citations omitted). "Exceptions to this rule are 'rare,' even in instances involving relatively short time periods." *Id.* at 449 (citing *Mickey*, 516 F.3d at 525 (holding that causation was established by temporal proximity where, among other things, the employee was fired the same day his employer learned of his protected activity). However, "close temporal proximity" coupled with other evidence, such as "evidence of heightened scrutiny" of a plaintiff's job performance "may be enough to satisfy a Title VII plaintiff's burden on causation at the *prima facie* stage." *Id.* At the same time, "an intervening cause between protected activity and an adverse employment action [may] dispel[] any inference of causation." *Id.* at 450.

Here, the court finds that approximately one month between the protected activity and the "last chance" write-up for an arguably trivial (and potentially unintentional) infraction is sufficiently short to give rise to a permissible inference of a causal connection between them and, ultimately, between those events and the plaintiff's termination. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 427 (6th Cir. 2021) (finding a "one-to two-month time lapse between the protected activities and the adverse actions suffices to establish a genuine issue as to causation"); *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 664 (6th Cir. 2020) (explaining that an adverse employment action "just a few months" after learning of a plaintiff's protected activity is sufficient to establish

causal connection on temporal proximity alone).

The defendant, however, offers a legitimate, non-retaliatory reason for the termination: the plaintiff's write-up for PPE infractions and his repeated absences from his work station. The question, then, is whether the plaintiff can establish that this reason is actually pretext for retaliation. He may do so by presenting evidence that, for example, the proffered reason "has no basis in fact," "did not actually motivate the adverse action," or "was insufficient to motivate the adverse action." *Id.* at 451 (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)).

In this case, the plaintiff admits that he violated multiple company policies after the graffiti incident, and he offers no evidence to refute the defendant's showing that his treatment was consistent with that of other employees who engaged in the same conduct. He does not actually dispute that he was absent from his work station. Instead, he offers garbled and unsupported testimony about a different machine than the one to which he was assigned being "down." (*See* Jones Dep. 62-63.) He offers no evidence from which a reasonable jury could conclude that the proffered reason did not actually motivate his termination or was insufficient to motivate it.

The court finds that the plaintiff has failed to offer evidence of pretext. The defendant is entitled to summary judgment on this claim as well.

### D. FLSA Claim

#### 1. *Whether the Plaintiff Worked Uncompensated Overtime Hours*

The FLSA requires an employer to pay its employees overtime wages at a rate of not less than one and one-half times the regular rate of pay for every hour that employees work over 40 hours per week. *Viet v. Le*, 951 F.3d 818, 822 (6th Cir. 2020); *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 806 (6th Cir. 2015); 29 U.S.C. § 207(a)(1). The employee claiming that he was not paid this overtime rate "has the burden of proving that he performed work for which he was not properly compensated." *Viet*, 951 F.3d at 822 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328

U.S. 680, 687 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972)). If the employee "carries this initial burden but cannot recall the precise number of unpaid overtime hours, the employee may seek the work records that the FLSA requires employers to maintain." *Id.* (citing *Anderson*, 328 U.S. at 687). If the employer has failed to keep the requisite records, the employee may still establish his damages by "produc[ing] sufficient evidence to show the amount and extent of [his uncompensated] work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. The "threshold question," however, before reaching the question of damages and the plaintiff's proof of damages, is whether he can establish that he worked overtime in the first place. *Viet*, 951 F.3d at 822.

This case, like *Viet*, concerns the threshold question of whether the evidence presented by the plaintiff is sufficient to "permit a reasonable jury to conclude that he worked more than 40 hours per week during any given week" during his employment. As the Sixth Circuit has explained, the plaintiff must identify "specific facts, as opposed to general allegations," and "conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 823.

Aludyne has submitted proof, through the Sears Declaration, that employees at the Clarksville facility participated in pass-down meetings "[f]rom sometime in 2022 to May 2024," that the meetings occurred at shift changes and typically lasted from five to fifteen minutes, and that employees were expected to clock in upon their arrival at the Clarksville facility and prior to participating in the pass-down meeting. (Sears Decl. ¶¶ 15–19.) Sears also attested that time spent at the pass-down meetings was "included in total hours worked and . . . factored into overtime calculations, if applicable." (*Id.* ¶ 20.) The time records for Jones that Aludyne produced show that Jones regularly received credit for overtime work from March 1, 2022 through the termination of

his employment in September 2022. (Doc. No. 24-6.) According to Sears, "Jones and all other employees received full compensation for all compensable worktime, including all overtime pay." (Sears Decl. ¶ 22.) To counter this evidence, Jones testified that he was required to attend pass-down meetings prior to each shift, that each meeting lasted approximately thirty minutes, and that he was "told to punch in" after attending the meetings. (Jones Dep. 19.) He would punch in after the nightly thirty-minute pass-down meeting concluded and begin operating his machine when his shift started. (*Id.*)

Aludyne asserts that no reasonable jury could believe the plaintiff's version of events because it is "self-serving," "unsupported by additional evidence," and directly contradicted by the timekeeping records. (Doc. No. 23 at 24.) More specifically, it claims that

> Plaintiff's schedule and time detail reports . . . show he consistently clocked in within minutes of his scheduled start time. While Plaintiff claims he spent about 30 minutes in passdown meetings before clocking in, the timekeeping records directly contradict that assertion. If Plaintiff's testimony were accurate, his time detail report would reflect a significant gap between his scheduled start time and his actual clock-in time each day. Instead, the records show that he regularly clocked in almost exactly at the time his shift was scheduled to begin, making it impossible for him to have attended a 30-minute passdown meeting before clocking in.

(*Id.* at 24–25.) The court is not persuaded by this assertion, which itself is illogical. The plaintiff stated that Aludyne's time records accurately reflect his punch-in times but that he arrived at the plant early at every shift and attended pass-down meetings before clocking in. (*See* Jones Dep. 24–25 (disputing the accuracy of the time records as not reflecting the time he actually arrived on the floor).) The time records do not contradict that statement. The plaintiff agreed that the time records accurately reflect the days and shifts the plaintiff worked and the clock-in and clock-out times on which his pay for each week (including overtime) was calculated but do not reflect the pass-down meetings.

Moreover, the plaintiff's testimony is no more self-serving and unsupported by other evidence than the defendant's. Aludyne offers the Sears Declaration. The plaintiff offers his own deposition testimony. The parties' statements are directly contradictory. The court finds that there is a material factual dispute as to whether the plaintiff worked overtime hours for which he was not compensated.

### 2. Statute of Limitations

FLSA claims are generally governed by a two-year statute of limitations. 29 U.S.C. § 255(a). FLSA claims may be subject to a three-year limitations period, however, when an employer's statutory violation is "willful." *Id.* To show that an employer acted willfully, the plaintiff must present proof that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 414 (6th Cir. 2022) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). In the Sixth Circuit, willfulness may be shown where the employer "had actual notice of the requirements of the FLSA by virtue of earlier violations, [its] agreement to pay unpaid overtime wages, and [its] assurance of future compliance with the FLSA." *Id.* at 415.

Aludyne disputes that any overtime violation has occurred in this case, and it further argues that the plaintiff, in any event, has provided no proof of willfulness. (Doc. No. 23 at 28.) The plaintiff argues in response only that whether a violation was "willful" "is a fact question inappropriate for summary judgment." (Doc. No. 26 at 5 (citing *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999)).) In *Herman*, however, the district court "properly found that Defendants' violations were willful" where the plaintiff presented evidence that the defendant "had actual notice of the requirements of the [FLSA]," "had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured the DOL that he would comply in the future."

*Herman*, 183 F.3d at 474. The plaintiff presents no evidence of the kind here—and, in fact, no evidence whatsoever from which a jury could find willfulness. The defendant is entitled to summary judgment on the issue of whether a two-year or three-year limitations period applies to the plaintiff's FLSA claim. The court will apply a two-year limitations period. Because the plaintiff filed suit on March 1, 2024, his FLSA claim covers the period from March 1, 2022 until his termination in September 2022.

   3. *The Offset Issue*

   Aludyne argues that, even if the plaintiff could establish that he was entitled to overtime pay in connection with the pass-down meetings, it is undisputed that the plaintiff was actually paid for the otherwise non-compensable thirty-minute meal break. It contends that this time was also included in the company's overtime computations and that, as a result, any claim to overtime pay the plaintiff may have is "wholly negated by Aludyne's payment for non-compensable lunch breaks." (Doc. No. 23 at 27.) Quoting *Bray v. Dog Star Ranch, Inc.*, No. 1:08-CV-1005, 2010 WL 889908, at *15 (W.D. Mich. Mar. 10, 2010), the defendant asserts that "[p]laintiffs are to be made whole; they are not entitled to a windfall at Defendants' expense." (Doc. No. 23 at 27.) Aludyne also points to the plaintiff's testimony, in which he confirmed that he understood that meal breaks were not compensable under the FLSA and that "the 30-minute lunch would then set off the 30 minutes [he was] alleging that [he] came in early." (Jones Dep. 46.)

   The plaintiff concedes that he was paid for his thirty-minute lunch breaks. He argues, however, that this is "legally irrelevant," because "[e]mployers cannot offset unpaid compensable work time with paid breaks." (Doc. No. 26 at 5 (citing 29 C.F.R. § 785.19).)

   The Sixth Circuit does not appear to have considered the issue presented here, but the Third Circuit, at least, agrees with the plaintiff. In S*miley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325 (3d Cir. 2016), an employer sought a similar offset for paid lunch breaks. The district court

was persuaded by this argument and held that the plaintiffs were not owed any additional compensation because the amount of paid non-work time (paid lunch breaks) exceeded unpaid work time (pre- and post-shift time spent donning and doffing uniforms and protective gear and participating in a "shift relief" meeting). *Id.* at 328. Although the district court recognized that "[t]he FLSA does not expressly grant employers permission to use paid non-work time to offset unpaid work time," it "nonetheless concluded offset was not specifically prohibited and therefore granted summary judgment in favor of DuPont." *Id.* at 328–29. The Third Circuit, relying on 29 U.S.C. § 207(h) of the FLSA, rejected such a credit, stating, "It is undisputed that the compensation paid for meal breaks was included in plaintiffs' regular rate of pay, and thus could not qualify as 'extra compensation.'" *Id.* at 333. Instead, the court narrowly construed the "offset" provisions of § 207 to apply only when a premium rate has been paid. *See id.* (construing the "credit" permitted by § 207(h) as "pertain[ing] only to 'extra compensation,' which is distinct from regular straight time pay"). And it concluded that "there is no reason to distinguish between compensation for productive work time and compensation for bona fide meal breaks. Compensation included in, and used in calculating, the regular rate of pay is reflective of the first forty hours worked. We agree . . . that allowing employers to then credit that compensation [for paid meal breaks] against overtime would necessarily shortchange employees." *Id.* at 334 (internal quotation marks and citation omitted).[6]

Based on the Third Circuit's persuasive reasoning in *Smiley*, the court finds that the fact that the defendant voluntarily paid its employees for time spent on meal breaks does not absolve it of liability if it, in fact, did not pay them for time spent at pass-down meetings. The defendant is

---

[6] *Bray*, the case cited by the defendant, is not on point and does not hold otherwise. There, the question of offset related to the defendant's computation of damages, not the question of liability. *See Bray,* 2010 WL 889908 at *13.

not entitled to summary judgment on the FLSA overtime claim, but the question of the calculation of damages remains open.

## IV.     CONCLUSION

For the reasons set forth herein, the court finds that defendant Aludyne is entitled to summary judgment on the plaintiff's discrimination and retaliation claims under Title VII and § 1981. However, a material factual dispute exists as to whether the plaintiff was required to attend thirty-minute pre-shift pass-down meetings prior to clocking in without being compensated for attending such meetings, precluding summary judgment on the plaintiff's FLSA claim. The court finds, however, that a two-year statute of limitations applies to the FLSA claim, based on the plaintiff's failure to present any evidence that the defendant willfully failed to comply with the FLSA. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge